IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

IN THE MATTER OF:                )         CASE NO. BK11-40936
                                 )
SUZETTE WOODWARD,                )         CH. 11
                                 )
                   Debtor.       )

### ORDER

      Trial was held in Lincoln, Nebraska, on February 25, 2014, on the amended Chapter 11 plan filed by Debtor (Fil. #221) and an objection to confirmation of the plan filed by creditor Heritage Bank (Fil. #226). John C. Hahn appeared for Debtor, and Kent E. Rauert appeared for Heritage Bank. This order contains findings of fact and conclusions of law required by Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52. This is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(L).

      Heritage Bank, an unsecured creditor of Debtor, has objected to confirmation of Debtor's third amended plan of reorganization. Heritage Bank has raised three primary objections to confirmation. First, it argues that the plan cannot be confirmed because no class of impaired claims has accepted the plan as required by 11 U.S.C. § 1129(a)(10). Second, Heritage Bank argues that the plan violates the absolute priority rule of 11 U.S.C. § 1129(b)(2)(B). Third, Heritage Bank argues that Debtor is not devoting all of her projected disposable income to the plan as required by 11 U.S.C. § 1129(a)(15).

      For the reasons discussed below, the plan is not confirmed and Debtor is ordered to file an amended plan consistent with this Order.

*Background*

      The following facts are undisputed or were otherwise established at trial:

      1.    Debtor filed for relief under Chapter 7 of the United States Bankruptcy Code on April 4, 2011.

      2.    Heritage Bank is an unsecured creditor of Debtor having filed proofs of claim (Claims #4 and #5) on August 18, 2011, totaling $270,566.00.

      3.    Debtor's obligation to Heritage Bank came about as a result of several loans made by Heritage Bank to Debtor, her former spouse, and Woodward Construction & Custom Renovations.

      4.    Debtor resides at 2604 Arrowhead Road in Grand Island, Nebraska. She acquired the property from Leland and Marie Elliott on May 15, 2012, which was after her Chapter 7 filing. Mr. and Mrs. Elliott are secured by a deed of trust on the property.

5.  On August 15, 2012, Debtor filed a motion to convert her Chapter 7 proceeding to one under Chapter 11. Said motion was granted by the court on September 10, 2012, and the case was converted to Chapter 11.

6.  Prior to and throughout the duration of Debtor's bankruptcy, she has been employed as a pathologist. Debtor has been both an employee and owner/member of Pathology Specialists, LLC, located in Grand Island, Nebraska, throughout the duration of her bankruptcy.

7.  Debtor filed a third amended Chapter 11 plan (Fil. #221) ("plan") on November 11, 2013. Heritage Bank objected to confirmation of said plan by filing an objection to confirmation (Fil. #226) on December 16, 2013.

8.  The plan proposes to pay Heritage Bank $519.00 per month as its pro rata share of Debtor's projected disposable monthly income of $1,000.00 for a period of five years.

9.  Under the terms of the proposed plan, a balloon payment due to Mr. and Mrs. Elliott was extended by one year to June 1, 2014.

## *Discussion*

### *Acceptance by an Impaired Class*

Heritage Bank argues that the debt to Mr. and Mrs. Elliott arose post-petition and, therefore, they are not "creditors" entitled to file a proof of claim and vote on the plan in this case. Specifically, the term "creditor" is defined in 11 U.S.C. §101(10) in part as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." Further, under § 501, only creditors and indenture trustees are entitled to file proofs of claim.

While certainly creative, I am not persuaded by Heritage Bank's argument that only pre-petition creditors are entitled to file claims. First, it overlooks the fact that post-petition "claims" are routine. In fact, § 502(i) expressly recognizes one such type of post-petition claim for certain taxes, stating: "A claim that does not arise until after the commencement of the case . . . ." Here, the secured claim of Mr. and Mrs. Elliott arose post-petition but pre-conversion. Upon conversion, this court set a new claim filing deadline for the Chapter 11 case. Debtor listed the property securing the claim in amended schedules upon conversion and at all times the property was treated as property of the Chapter 11 estate. In fact, § 1115 clearly defines property of the estate to include all property described in § 541 (pre-petition property) and all property acquired after commencement of the case. It is illogical to include the property securing the debt as property of the estate but deny the lender the right to file a proof of claim.

Further, after conversion and establishment of a new claim filing deadline, Mr. and Mrs. Elliott filed a late proof of claim asserting a security interest in the principal place of residence of Debtor. Heritage Bank objected to the claim filed by Mr. and Mrs. Elliott. After a hearing, this court

entered a text order (Fil. #236) on February 3, 2014, overruling Heritage Bank's objection to the claim of Mr. and Mrs. Elliott, stating:

> The objection to claim is overruled. The claim is a secured claim that would otherwise pass through bankruptcy unaltered regardless of whether a proof of claim is filed. The claim was scheduled by debtor upon conversion to Chapter 11 and was not listed as disputed, contingent or unliquidated. In fact, Debtor does not dispute that claim and requests that it be allowed. The claim is consistent with Debtor's schedules, as amended. No prejudice will result to any party from the allowance of the claim. Accordingly, the objection is overruled.

Heritage Bank did not appeal the order overruling its objection to Mr. and Mrs. Elliott's claim. Therefore, it is final. It is undisputed that Mr. and Mrs. Elliott voted to accept the plan. It is further undisputed that the plan modifies the maturity date of the loan made by Mr. and Mrs. Elliott and, therefore, their claim is impaired. Since Mr. and Mrs. Elliott accepted the plan, it has been accepted by an impaired class. Accordingly, Heritage Bank's objection based on the lack of acceptance by an impaired class is overruled.

*Absolute Priority Rule*

Heritage Bank holds the largest single claim in the unsecured creditor class, which is impaired under the plan. Due to the size of its claim, Heritage Bank's rejection of the plan constitutes a rejection by the unsecured creditor class. When an impaired class has rejected a Chapter 11 plan, the plan can still be confirmed under the "cram down" provisions of 11 U.S.C. § 1129(b). In order to be confirmed under the cram down provisions, the plan must not discriminate unfairly and must be fair and equitable with respect to each impaired class rejecting the plan. In order to be fair and equitable, the unsecured claims must be paid in full or the absolute priority rule of 11 U.S.C. § 1129(b)(2)(B)(ii) must be followed. The plan does not provide for payment of the unsecured creditors in full, so debtor must follow the absolute priority rule to achieve confirmation. The absolute priority rule requires that:

> [T]he holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, *except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115*, subject to the requirements of subsection (a)(14) of this section.

11 U.S.C. § 1129(b)(2)(B)(ii) (emphasis added). Section 1115 was added to the Code by the 2005 BAPCPA amendments and provides as follows:

> § 1115. Property of the estate
> (a) In a case in which the debtor is an individual, property of the estate includes, in addition to the property specified in section 541 —

-3-

>  (1) all property of the kind specified in section 541 that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 12, or 13, whichever occurs first; and
>  (2) earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 12, or 13, whichever occurs first.

In *In re Tegeder*, 369 B.R. 477 (Bankr. D. Neb. 2007), I held that by virtue of the italicized clause in 11 U.S.C. § 1129(b)(2)(B)(ii) above and the language of 11 U.S.C. § 1115, defining property of the estate in individual Chapter 11 cases, the absolute priority rule no longer prevents an individual debtor from retaining pre-petition assets in order to confirm a plan under the cram down provisions. *Id.* at 480. By arguing that the absolute priority rule should apply in this case, Heritage Bank is inviting me to reconsider my ruling in *Tegeder*. I decline to do so. Heritage Bank is correct that the weight of authority in the last few years has been to the contrary. That is, a majority of the courts hold that the absolute priority rule has been abrogated only in part and that individual Chapter 11 debtors are not allowed to retain pre-petition assets but may retain post-petition assets and earnings. My 2007 ruling in *Tegeder* has become known as the "broad view" while the courts holding that the absolute priority rule for individual Chapter 11 debtors has been abrogated only in part has become known as the "narrow view."

When I wrote *Tegeder*, there were no decisions espousing the narrow view. Now, almost seven years later, there are many such decisions and, with hindsight, I certainly understand and appreciate the statutory interpretations leading to the narrow view. Frankly, I believe both views have merit and the issue has been debated repeatedly in written opinions and commentary over the last several years. I will not belabor the point here by reiterating all the arguments on each side of the equation, but will say that I do not believe the logical rationale for the narrow view is overwhelming enough for me to reverse course. The broad view has worked well in this jurisdiction the last seven years and as a result, many individual Chapter 11 plans have been successful.

I agree with the recent opinion of the late James G. Mixon, Bankruptcy Judge for the Western District of Arkansas, stating:

> The weakness of the narrow view is illustrated if one were to ask the question: "If Congress was not attempting to write out of individual Chapter 11 cases the absolute priority rule, what was the purpose of all of the BAPCPA amendments to Chapter 11, including section 1115, which were obviously borrowed from Chapter 13?" Chapter 13 has no absolute priority rule and would not be of much use if it did. The means test for Chapter 7 debtors created by BAPCPA was designed to move debtors who could pay something to their creditors to reorganization chapters. Here, these Debtors have no recourse to either Chapter 13 or Chapter 12 because of the debt limits imposed by Congress.

*In re O'Neal,* 490 B.R. 837, 850-51 (Bankr. W.D. Ark. 2013) (footnote omitted).

Judge Mixon also went on to say, "Section 1115 is written word for word like section 1306 and courts interpreting section 1306 have never bifurcated this section into two species of property as the narrow view does in individual Chapter 11." *Id.* at 851. Again, valid arguments can be made for both views, but I maintain that the broad view is the better fit with the apparent overall goals of the 2005 amendments. Accordingly, Heritage Bank's objection based on the absolute priority rule is overruled.

*Disposable Income*

Heritage Bank next argues that Debtor is not devoting all of her projected disposable income to the plan as required by 11 U.S.C. § 1129(a)(15). That section requires, as a condition of confirmation of a plan in an individual Chapter 11 case over the objection of an unsecured creditor, that "the value of the property to be distributed under the plan is not less than the projected disposable income of the debtor (as defined in section 1325(b)(2)) to be received during the 5-year period beginning on the date that the first payment is due under the plan . . . ." § 1129(a)(15)(B).

As a result of the incorporation of § 1325(b)(2) into § 1129(a)(15), the parties have thrown a smorgasbord of issues at the court. Section 1129(a)(15) specifically incorporates Chapter 13's disposable income definition found in § 1325(b)(2), but it is silent as to the determination of reasonable expenses for purposes of calculating disposable income. That is, while § 1325(b)(3) can be read as an instructional section of permissible expenses for § 1325(b)(2) – and, therefore, presumably incorporated into § 1325(b)(2) – § 1129(a)(15) does not include it. The omission seems intentional, as noted in a leading bankruptcy treatise:

> [T]he reference in section 1129(a)(15) is explicitly to, and only to, paragraph (2) of section 1325(b). Congress had it within its power to draft the cross-reference more broadly, but did not. It presumably took into account the business orientation of most chapter 11s, as well as the increased levels of creditor involvement in a chapter 11 cases. These factors, together with the requirement that the debtor obtain the consent of all unsecured creditor classes under section 1129(a)(8), would tend to indicate that individual creditor insistence on the artificial expenses standards found in chapter 7 are neither necessary nor appropriate in chapter 11 cases.

7 *Collier on Bankruptcy* ¶ 1129.02[15][a] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev. 2014) (footnotes omitted).

In accordance with the statute, Official Form 22B, the Chapter 11 Statement of Current Monthly Income, omits the expense deductions used in the means test. The Kansas bankruptcy court noted the reasoning for that given by the Bankruptcy Rules Advisory Committee when it drafted the interim rules and forms under BAPCPA:

The Committee explained:

> The Chapter 11 form is the simplest of the three [22A, 22B, and 22C], since the means-test deductions of § 707(b)(2) are not employed in determining the extent of an individual Chapter 11 debtor's disposable income. Section 1129(a)(15) requires payments of disposable income "as defined in section 1325(b)(2)," and that paragraph allows calculation of disposable income under judicially-determined standards, rather than pursuant to the means test deductions, specified for higher income Chapter 13 debtors by § 1325(b)(3).

*In re Roedemeier*, 374 B.R. 264, 272 (Bankr. D. Kan. 2007) (footnote omitted).

Here, Debtor is proposing to pay projected disposable income of $1,000.00 per month for five years into her plan for distribution to unsecured creditors. Heritage Bank, arguing that the means test applies, calculated Debtor's disposable income using § 707(b)(2)(A) and (B) and determined that Debtor has monthly disposable income of $12,251.60 available to her.

Accepting for purposes of this case Debtor's position that means-test deductions are not considered when calculating a Chapter 11 debtor's disposable income, I nevertheless find that Debtor has not supported her proposed plan payment.

For one thing, the evidence indicates Debtor has a steady and significant income. Her gross share of Pathology Specialists' income in 2011, 2012, and 2013 exceeded $330,000.00. Her adjusted gross income for tax purposes was $253,291.00 in 2011 and $241,190.00 in 2012. Her 2013 tax return is not part of the trial record, but the cumulative 2013 financial statement (Fil. #245), combined with the business's 2013 retirement contribution, would result in adjusted gross income similar to that of 2012. Conservatively, these figures demonstrate available monthly income of $20,000.00. Even Debtor's pro forma statement of current monthly income and calculation of disposable income (Fil. #264) shows a gross monthly income of $20,894.39.[1]

Debtor also claims to have monthly expenses of $20,170.02, which Heritage Bank generally disputes. Heritage Bank did not challenge particular household expenses, but asked the court to consider the overall reasonableness of the claimed expenses.

---

[1] Debtor testified at trial that she anticipates a reduction in income because a temporary consulting agreement will end in mid-2014, so she expects that her 2015 income will be markedly less than what she has earned heretofore. This expectation by Debtor does not change the amount of disposable income available to her now. The plan should account for what she can pay into it at this time. If her circumstances change, she may move to have her plan modified.

One expense which Heritage Bank did specifically question is Debtor's contribution to the profit-sharing portion of her employer's retirement plan. The plan consists of a voluntary 401(k) component in which Debtor does not participate, and a majority-ruled profit-sharing component for which the business partners vote to contribute. If the majority of the partners agree to participate, then all the partners must participate, and they each must contribute the same amount. The partners apparently have decided to contribute $10,000.00 each through the profit-sharing plan for 2013. Debtor believes – and one of her partners testified – that her employment would be adversely affected if she opted not to participate. Accordingly, she wants to treat the contribution as a mandatory payment that is not included in disposable income.

In the disposable income analysis in Chapter 13, courts have tended to find that retirement plan contributions deemed compulsory, either by the debtors' employers – often, municipalities, school districts, and other unionized entities – or by state law, may be excluded from the computation. *See, e.g.*, *In re Caraballo Rivera*, 328 B.R. 12 (Bankr. D.P.R. 2005); *In re Awuku*, 248 B.R. 21 (Bankr. E.D.N.Y. 2000); *In re Tibbs*, 242 B.R. 511 (Bankr. N.D. Ala. 1999); *In re Davis*, 241 B.R. 704 (Bankr. D. Mont. 1999). In the present case, the contribution is not compulsory. Moreover, the profit-sharing plan is only one component of the Pathology Specialists retirement plan. The members can and do contribute to individual 401(k) plans. What makes Debtor's argument against including the profit-sharing funds even less compelling is the fact that the doctors have not consistently made annual profit-sharing contributions. Most of them have contributed less than the full amounts to their 401(k)s, and have not regularly taken advantage of the retirement funding options available to them. For Debtor to now claim that a potential $10,000.00 contribution to the plan is mandatory and, therefore, beyond the reach of her creditors is an effort to shield funds for her own benefit. It is unclear from the evidence whether such a contribution is expected to be made this year, but either way it should be accounted for in Debtor's disposable income.[2]

Other expenses appear to be over-estimated. For example, Debtor calculated the monthly average of her tax bill to be $10,288.09 (Fil. #263). However, her actual taxes were considerably less. The monthly average of state and federal tax payments was $7,405.00 in 2012, and $8,021.00 in 2011. Debtor testified about an entry in her January 2014 operating report of $36,000.00 for taxes. She explained that she owed taxes on interest earned on a FICA tax refund, which created an aberration in her monthly tax calculations. In other words, that large tax payment was a one-time occurrence and should not be factored into her average monthly expenditures. The discrepancy between the historical average of her tax bill and the figure she uses in her disposable income calculations would provide at least $2,000.00 per month in available cash.

In addition, a number of the household expenses appear to have room for economy. For instance, Debtor claims $1,752.74 for monthly food expenses. She testified that the number is high because the three children who reside with her full-time are involved in numerous extracurricular activities, church activities, and volunteering opportunities and, as a result, many of the family's

---

[2]In any event, under the extraordinary circumstances of this case, a $10,000.00 annual contribution is relatively minor as her current monthly income would still be more than $20,000.00.

meals and snacks are eaten away from home. Likewise, she lists $837.27 for clothing and personal care, and $800.00 for gifts, donations, and tithing. The list of expenses also includes $976.00 for vehicle expenses (fuel, taxes, insurance, repair). That amount appears to be for two vehicles driven by her teenagers, as Pathology Specialists pays Debtor's vehicle expenses. These expenses are all significantly higher than what the United States Bureau of Labor and the IRS deem to be the average or standard expenditures in those categories for a family of five. While Debtor testified that she downsized her family's living arrangements because of her financial constraints – which is reflected in her modest mortgage and utility expenses – there has been little explanation for the generous spending on the categories mentioned above, other than Debtor's desire to maintain the standard of living to which her family has been accustomed. That degree of lifestyle maintenance should not come at the expense of creditors.

Whether the means test is applied here or whether the court simply assesses the reasonableness of the claimed expenses, it is clear that Debtor has more than $1,000.00 per month in disposable income with which to pay her unsecured creditors. For that reason, confirmation of her third amended plan of reorganization is denied.

IT IS, THEREFORE, ORDERED that confirmation of Debtor's third amended Chapter 11 plan (Fil. #221) is denied. Debtor shall have 14 days in which to file a further amended plan.

DATED: April 29, 2014.

BY THE COURT:

/s/ Thomas L. Saladino
Chief Judge

Notice given by the court to:
    *John C. Hahn
    Kent E. Rauert
    United States Trustee

*Movant is responsible for giving notice to other parties if required by rule or statute.